on behalf of Randy Boudreaux. So the question is, what's left after McDonald's, right? You're right, Your Honor. And this case offers this court the opportunity to enforce and underscore McDonald's key ruling that a bar that engages in non-germane speech, that is, speech that is unrelated to the regulation of the practice of law, cannot compel association. I have three brief points to emphasize here today in my argument, Your Honors. But before we begin, I'd like to focus in on the first principles that are so important in a matter such as this. Those are that the overwhelming default rule is that people are free to associate. They're free to join or not join organizations. There are many organizations that do good charitable work, the Salvation Army, that do political work, the political parties, that do work for lawyers or serve as voluntary bar associations, such as the American Bar Association or the Federalist Society. But people are not compelled by the power of the state to join any of those to practice their profession. The overwhelming default rule is freedom. And the case law makes clear that when you depart from that default rule, it has to be for very clear and clearly defined purposes. And in this case, that clearly defined purpose, of course, is the regulation of the practice of law. And this court talked about that in McDonald and in Boudreau I. And this case offers a key opportunity to reinforce the ruling that the court determined then. Something important in this case that the trial revealed was that the LSBA does not do some of the core regulatory functions that a bar association could do. The LSBA does not admit lawyers. That's done by a separate entity. The LSBA does not issue new rules of ethics. That's done by a separate entity, the Louisiana Disciplinary Board and the Supreme Court. And the LSBA does not discipline lawyers. And that's a key distinction that's different from the bar in the state of Texas, where the bar of the state of Texas office of disciplinary counsel disciplines lawyers. The bar does some charitable events. The bar does networking events. The bar does mentorship. The bar keeps track of CLE hours. But those core regulatory functions, which are so critical here, are not performed by the bar. And so the key issue is whether or not there can be a mandatory association. And they're permissible, as the case law shows, when there's a compelling state interest and there's not a less restrictive way of enforcing it. And as you pointed out in your opinion, Your Honor, in McDonald, there are 20 states that have a less restrictive methodology, where there's direct enforcement, direct regulation by the Supreme Courts of those states. And those states, no one can argue, don't fail to regulate. On this one, though, can you, or maybe you have something before this, but is there anything in the record to indicate that the bar might revive its non-germane political activities, since they have shut those down? Very much so, Your Honor. And so we think this is really critical. And we've pointed out that the LSBA engage in all sorts of non-germane activities. We've also talked about their expressive activity and their expressions, their electronic communications. But they decided that they're going to really clamp down on that, and they've got new policies and things. You're right, Your Honor. But we don't believe that the bar sufficiently understands germaneness being rooted in regulation. And I can give the Court a very clear example right here and right now. As this Court did in McDonald, this Court can take judicial notice of things such as the bar's website. And while preparing for this argument, I was able to get on the website and look at their diversity initiative page. And the bar on the diversity initiative page has a enormous LGBT Pride Month flag. Now, there was a significant colloquy in McDonald 1 about the non-germaneness of issues such as that. Certainly, this is a political and ideological issue. Mr. Boudreau testified at the trial. As a gay attorney himself, he's testified about how non-discrimination laws are a good thing. But for the bar to continue to engage in non-germane speech, the Court, in a significant colloquy, talked about LGBT marriage and civil unions being non-germane in the McDonald opinion, and a colloquy with Judge Duncan. And so the fact that the bar is continuing to engage in this behavior, both in the electronic communications, without disclaimer, right on the website, is not something that Mr. Boudreau should be forced to associate with. He does not agree with every aspect of this movement. This is clearly a political and ideological and non-germane issue. But the bar continues to engage in this activity up to this day. And so their proclamations that they have no intent to violate McDonald going forward are undermined by what they're posting on their website while in the middle of active litigation. So what would you say is the remedy for that? The remedy is what we've outlined, a declaration and an injunction. In the McDonald opinion, this Court enjoined the Texas State Bar from continuing to collect dues while engaging in non-germane speech, because those violated the freedom of association of the plaintiffs in that matter. So, too, here, we've asked for an injunction. The Court consolidated the motion for preliminary injunction with the trial on the merits. But those issues are before this Court. And we believe that that's the appropriate remedy. Before the McDonald case, the case went to a remedies phase and is in a remedies phase right now to ensure that there's not this non-germane speech. In your view, then, I assume if the website said, we wish everyone a happy Independence Day celebration for the 4th of July, or we wish all of our members a Merry Christmas and a Happy New Year during holiday season, that those would be prohibited communications on the website? This Court made clear that the issue, Your Honor, is not whether or not the communications are controversial, because there are some controversial issues about ethics rules and other things that directly relate to the practice of law. It's whether they're non-germane. And again, there are lots of organizations out there that can wish people Merry Christmas and can support charities, but for compelled associations. So your answer is, yes, those should be prohibited? Yes, sir. Our answer is that those should be prohibited if they're not germane to the practice of law, which is directly tied to the regulation of the legal profession. While I support saying Merry Christmas to people, that's not germane to the practice of law, Your Honor. And so we think that all of the LSBA's prior actions, it's lobbying on over 407 bills, taking positions on free enterprise, concealed carry, LGBT issues, executions, oyster leases, art therapists, were clearly non-germane. The other- And those were in the past, is that right? Yes, sir. But what's critical about those, sir, and why that feeds into our voluntary cessation argument on mootness, our second point, is that the bar continues to maintain that all of that was germane. And during the trial, the court expressed some skepticism about this and asked, I just want to clarify one thing if I can, the court asked. The testimony that the last question, what the bar was doing before McDonald, I think your answer was yes. The witness, that's correct. Court, the court, do you take the position what the bar was doing before McDonald but also be within legal limits now after McDonald? The witness, who is the leader of the bar, I believe it would be under the legal limits of McDonald. So the fact that they view all of these lobbying activities as germane to this day suggests that they're not going to be ceasing in the future, as supported by what's continuing to happen on their website, as supported by all of these electronic communications that we pointed out, which we don't believe are minor, and this court talked about in footnote 28 that the bar cannot simply make sophistic or attenuated arguments for why things relate to the regulation of the practice of law. In that context, this court was talking about some of the diversity issues. And we think that if you look at the district court, they're ruling on, for example, the student debt tweet. It was that lawyers, because lawyers are concerned with this matter of public policy. That can't be the standard. Lawyers are also concerned with nuclear weapons and gun control and all sorts of issues that the case law says they can't talk about. Do they maintain the position that it's OK to tweet about the student debt to this day? Yes, Your Honor. That was one of the issues in the trial. And they said, we can tweet about student debt. That was one of the 17 tweets that was pointed out about an article about student debt policy. But they have not stopped. No, Your Honor. You're saying that they're continuing on. Yes, Your Honor. The record on appeal points out all of those communications that are occurring. And those involve some lawyer wellness issues that they argue, hey, this is for the mental and physical well-being of lawyers. Again, these are attenuated arguments. Nuclear bombs and gun control could be important for the well-being of lawyers. But that's not the test. The test is, as this court laid out at McDonald, the issues about lawyer regulation of lawyers qua lawyers versus substantive law. The second issue that they continue to engage on are policy positions. There's six policy positions that the bar has approved in the bar's name by their House of Delegates and their Board of Governors. And Mr. Boudreau identified that he disagreed with those policy positions. Those policy positions include issues such as access to justice. Now, this court in McDonald said that access to justice issues generally can be germane. But they can also be non-germane when they relate to and address substantive law issues beyond simply the regulation of lawyers. When they go lobby in Austin, I assume, to go ask for additional funding or for more broad changes to the public law. Those larger substantive policy issues are not germane to the practice of law. Are there any others besides access to justice? Yes, Your Honor. Access to justice, Mr. Boudreau talked about unauthorized practice of law and occupational licensing of paralegals and things like that. So the unauthorized practice of law, access to justice, and diversity, advancing diversity is one of the public policy positions of the bar. Again, that's a very broad scope. And there has been some change in law in the meantime. We've had students for fair admission that says that these policies for racial preference policies violate racial discrimination laws. And so we don't believe it would be germane for the bar to address those kinds of issues under the auspices of diversity. Is it just diversity, or does it say DEI or anything? Well, if you look deeper on their statement of diversity principles, it's some of the same principles of diversity, equity, or inclusion, which we know is one of the most contentious political issues of our time. Now, of course, the political and ideological nature of it is not the question. The question is whether it's germane. And we don't believe that it is for them to get into this issue. We've pointed out dividing people up by race is extremely controversial. And it's not actually good for the community of lawyers writ large. So you're saying these are not, they haven't stopped these because they believe they are germane. Exactly, Your Honor. So while they stop giving comments about gun control or whatever because they understand that's not germane, or we don't know whether they understand that's not germane. Well, Your Honor, that's the problem with these electronic communications that continue to come out. And if it's germane for them to tweet about it or to provide electronic communications about it, it's also germane for them to lobby about it. So if they can tweet about student debt issues, why couldn't they go to the Capitol and lobby about those issues? That's not germane. That's not directly related to the regulation or the practice of law. And we think that the bar should focus in on its mission because there are less restrictive means for people to be regulated. They're effectively regulated in 20 states, including the largest legal markets in the country. And at the very least, what the bar is doing is beyond what the Texas bar is doing and has done that this court addressed in McDonald. And this court talked about the fact that there was not a de minimis. Can I ask a question? Yes. Can I ask a question? Does the record reflect how many employees this organization has today by comparison with how many it had before? I mean, one of the problems is all of this has been sort of in a state of flux. And whatever the number of employees they used to have, arguably, they don't need as many in view of the changes that have happened in the law. But if they still have the number of people, what that's going to promote is positions, bar association positions, which then they hire lawyers to defend. What's the size of the staff by comparison with what it was before the relatively recent cases? Well, Your Honor, the record does have some of the bar's budgets over the course of the years. And of course, that budget is growing. It does have the estimates for what different portions of the budget use. And this goes to the de minimis issue. Their communications staff, in McDonald, this court found the legislative activities violated the freedom of association. The percentage of the budget devoted to legislative activities there was 0.34%, right? So a third of 1%. In this case, the communications staff of the bar is over 10 times that. So this can't be a de minimis activity. I don't know exactly whether the LSBA is larger or smaller than it used to be. I do know that during the course of this litigation, they've taken on some additional responsibilities, such as the keeping CLE hours, right, for attorneys. We would argue that that was previously done by the Supreme Court. It could easily be done by the Supreme Court. There are other options of entities that could do this without all of this extra networking and communications and charitable apparatus, which people are free to join voluntary organizations to be part of, but that Mr. Boudreaux should not be compelled to be a part of. So you're not saying that maintaining your CLE hours for you is not germane? We are not, Your Honor. We believe that that's clearly germane. That's clearly regulatory. That's recognized by the court. Our argument is that other entities can do that easily. That's not so? Correct. Correct, Your Honor. You can't have a claim on that. Right. You're right, Your Honor. We don't contest that at all. That's the most regulatory thing that the bar does here, because so much of what else they do is not regulatory. Can you talk about the opt-out procedure and ABOOD and all of that, please? Yes, Your Honor. So the opt-out procedure requires an adequate explanation for the fee. And when you compare the notice provisions and the opt-out options here with Texas, we believe that the LSBA's opt-out procedures do not provide for sufficient notice for the fee. It's — Hudson reveals — Hudson is the bare minimum, this Court said, in McDonald and Boudreaux. Hudson reveals that there has to be a clear differentiation for these — anything that's potentially non-germane. The speech, for example, or there's legislative activity. And in this case, there's broad line items, but they don't indicate what the pro rata share of Mr. Boudreaux is. So if he wanted to object to the time spent sending tweets on non-germane issues, how would he possibly do that? There's no way to do it right now, Your Honor, because it doesn't say how much social media. They can track the time of their employees. They can track how much money they're spending on this. But there's no way currently on that budget to say, I don't want social media. We don't need to tweet about every issue. I need social media to say the bar meeting is on X day, and you need to get your CLE hours. So you might need some social media, but not to be doing part-time non-germane. You might — you're right, Your Honor. You might need some social media. And I didn't want to detract social media. I was worried Judge Willett might be on the panel. So, pending that, I will return for my rebuttal after the bar. Yes, Mr. Berry, you've saved time for rebuttal. Yes, sir. Mr. Stanley. Good morning, Your Honors. Rick Stanley here for the justices of the Louisiana Supreme Court and also for the Louisiana Bar Association. Let me begin by talking about what the Bar Association does and does not do, because I don't agree with my esteemed colleague. The LSBA is a mandatory bar association, but it helps regulate the profession in many ways. It works closely with the Louisiana Supreme Court to regulate the practice of law. It has specific responsibilities within the lawyer discipline system and also works to prevent lawyer misconduct and disabilities through its programming. One of the things that Mr. Baer mentioned right at the beginning of his presentation, and you heard it, was calling the attention to the website which he says shows the LGBT Pride Month flag. Can you address that as it relates to the issues in this case? Yes, Your Honor. First of all, I'm not certain about the website. I don't dispute that. I don't typically go to a lot of websites, but assuming that that is true, this court in McDonald's said that diversity in terms of creating equal opportunities for lawyers within the profession is a legitimate pursuit of the bar. So you take the position that recognizing Pride Month and promoting pride is a germane activity of the state bar. Is that correct, sir? Well, I'm only taking the position that it's not. If anything, it is a message that the Diversity Committee wants to get out as part of its message, but I want to be very clear about something. Is it germane or not? I think it is germane to diversity under McDonald's. But Pride is germane because it's diversity. Well, that's... Is student debt germane or not? Yes. For young lawyers who I teach at Tulane... Is gun control germane? No, it is not. Are there any... So other public... Is nuclear war, we heard on the other side, germane? Of course not. Of course not. Is abortion germane? Abortion is not germane. Is... I'm trying to think of controversial public policy, but Pride is germane. Is equity and inclusion germane? I don't... Yeah, I think equity to the extent that it refers to equity within the profession and professional opportunities is germane. But equity writ large, perhaps not. But student debt... What about affirmative action, as it's called? Is that germane, whether the Supreme Court allows law schools to discriminate or to remedy past deals, however you wish to choose to call it? I would think not, Judge, and here's why. McDonald laid down... Before McDonald, we had a foggy standard in Lathrop, for all intents and purposes. It was difficult under Lathrop to discern what could the bar speak about and what could not. Indeed, in McDonald, this court noted that there were three items that the Wisconsin bar did, which really weren't germane to anything. But in McDonald, this court said, if you're going to comment on legislation that involves changes to substantive law, that's wrong, you can't do that. And so it actually created a very clear standard for bar associations. And we took note of that. We didn't sit back. As soon as McDonald was decided, not only the LSBA, but the Louisiana Supreme Court acted immediately to change the landscape and change the rules. We did not choose to fight, we chose compliance. But you're still saying that certain things that arguably are very on the edge of whether they're germane or not are germane. What we tried to do, Judge, is read McDonald carefully and note, for instance, that diversity initiatives were found to be permissible in McDonald. Are pronouns, advocacy for use of people's pronouns, is that germane or not? I don't think that that is an issue that is in this record. I don't think there's any tweet about pronouns. And I think that that issue has never been brought to the bar. If someone asked me that issue, I would say no, it's not germane because it doesn't have anything to do with the legal profession. What about making sure people who identify as trans are treated equally in the workplace? Again, I think that's an issue of substantive law. Okay. And under McDonald, that is the standard. I think the court's opinion brought clarity where there was none. But student debt, paying off student debt is a germane issue. To the extent it affects young lawyers. Lots of things affect young lawyers. Housing prices affect young lawyers. Inflation affects young lawyers. So many things affect young lawyers. Student debt for young lawyers, and again, my second hat is that of a professor, is a crippling issue for a young lawyer who has $200,000 to $300,000 in debt but may want to pursue some career path that will not allow them to pay off that debt. But whether or not the executive branch can authorize student debt forgiveness is a political issue, isn't it, or a legal issue? No, no, Judge, you're right. When you said student debt, I'm focusing on student debt with respect to lawyers, not student debt as to whether President Biden had the right authority to do what he did. You're saying they did not have a right to tweet about that lawsuit or anything of the sort? And I don't think they did. Or whether it was forgiven or not. I don't think they did. I think, if anything, it was simply an announcement. The tweets that were- An announcement that what? Well, again, I have to say, I don't recall the particular tweet at issue. At issue in this case were 17 tweets out of 1,000 tweets that occurred over the course of two years. So that is the limited amount of what they identified as potentially non-germane speech. They take issue with wellness tweets. Well, wellness tweets are essential to getting lawyers to think about mental health and physical health to avoid disabilities under Rule 1.16 that would prevent them from representing their clients. Those are germane issues. Can you answer, if a person believes that the bar is sending non-germane tweets, and there's some evidence of that, just assume arguendo, then how does one go about getting your bar dues back for the proportion of the person working there? What do you do? You say you sent eight non-germane tweets, and that's 20% of your tweets this month, and therefore 20% of the salary of the social media person and their assistant need to be refunded to me, or? Well, I can tell you- How do you, how in the world does the person go about under this opt-out situation get their money back? So here's how it works, Judge, because we know how it works, because in Louisiana, we have had in the past some objectors, really with respect to legislation only, which we have ceased to do, and I want to come back to that. But answering- We're talking about social media. Answering your question about social media. Louisiana, within 45 days of any notification that you feel is non-germane, you have the right to object. You can just notify the executive director of your objection. When that happens, the amount of bar dues attributable to whatever category that is is then set aside in escrow, and the Board of Governors, in our history, in this record, invariably refunds it to the member. Now, do we- How long does it take to get your money back? About 60 days. 60 days you get your money back for the social media person's salary to time they spent sending inappropriate tweets? No, probably, we don't have that in the record because no one has ever objected, including Mr. Boudreau, who was fully aware of this, not once objected. But with legislation, you get the entire attributable amount of your dues to any legislative activities. We don't break it down per tweet, because it would be pennies. So it would be whatever the budget line item is, whatever percent that is of your dues, it would be refunded. That's how the bar has worked in the past. So what's the line item for social media, that you get the whole- It would be whatever the social media communication budget is, and it's not that great. And the bar dues aren't that great. Do you have any response to Judge King's question about whether there have been staff reductions as a result of the changes that you referred to earlier? Well, there have been changes, but I don't know about reductions. Honestly, I'm not aware of that, and it's not in the record. But I can tell you- You're unaware of whether there have been any. Well, what I do know is the legislation budget is now zero, and that previously the bar employed a lobbyist to pursue legislative activities, and that has ceased. So those have been eliminated, although those were not staff positions. And the staff members who were working on legislative activities have been reassigned to other places within the bar. And to answer actually Judge King's question, but I'm asking it too. Sure. You are not aware of whether there have been any staff reductions as a result of the changes that you referred to? Merely reassignments and the exclusion of lobbyists. We don't hire a lobbyist anymore. I wanna go back to something that Judge Elrod asked, because I think it's very important. After McDonald, what the Louisiana Supreme Court did, not the Louisiana State Bar Association, Louisiana Supreme Court changed its enabling rule. And it didn't simply say, if you speak on legislation, you take a political stance on legislation, just make sure it's germane. They specifically said that the Board of Governors shall limit any legislative activities to six issues. One, practice and procedure. Two, judicial system. Three, access to the courts. Four, compensation of judges or lawyers. Five, the legal profession. And six, to responding to requests from the legislature, period. That's it. This issue about diversity, we have no authority, no authority to take a position in the legislature on diversity. It would be contrary to the rule, contrary to the charter, and if we did so, someone could petition the Supreme Court to take action against the Bar Association. But you believe you have the right to take a position in the world on it, that you have a, I don't think you briefed the issue of the government's speech doctrine at the district court. To be honest, Judge. Or at the motion to dismiss, or in the consolidated PI hearing and trial. We reserved that issue in the district court in a footnote, so you're right. We didn't have any extensive briefing on that issue in the footnote. But it came up in your briefing to us, so you believe that you have a right to speak on diversity as have a position on it? We believe that if this court were to revisit the scope of Keller and Lathrop in this case, which I don't believe it will, that this court also should revisit the government's speech issue, because in Keller, it was specific to the Bar of California. Here, we are far more regulated by the Louisiana Supreme Court than was the Bar in California. Our speech activities are regulated and supervised by the Supreme Court, especially with regard to legislation. So does the Supreme Court take a position on pride, then? My knowledge, they don't, unless the issue Then why is the Bar, if it's supervised, taking a position on pride, which is different than non-discrimination of lawyers, isn't it? Judge, to some extent, I'm at a disadvantage, because I don't know what he's referring to on the website. I haven't seen it, I haven't visited it. So when we say, are we taking a position on pride, or was the flag depicted, I simply don't know. That was not part of the district court record in this case. Now, I understand he says it's on our website and you can take judicial notice of it, but I am not in a position to answer exactly why what the Bar did in that instance is permissible or impermissible. But you told me that it would be permissible earlier to take a position. If simply all they're doing is, in terms of reaching out to certain members of the legal community to participate in a diversity initiative that this court in McDonald's said was okay, then yes, it would be germane. If they were taking a political stance on it, then that would be a different matter entirely. And I don't- What if there were religious members of the Bar for which, for them, pride goeth before a fall, and so they don't believe in any pride at all? I'm just assuming arguendo, and I'm not expressing any viewpoints. I'm just wondering what happens with those Bar members? Well, we've had those issues. I am chairman of our rules committee, and by the way, let me say this. We were also said that, oh, the Bar has nothing to do with ethics rules. Oh, absolutely untrue. We propose ethics rules to the Supreme Court all the time. We monitor changes in the ABA rules, and we tell the court about those rules. We are far more involved in regulation than the argument you heard earlier would lead you to believe. But with respect to that issue, you may recall there was a proposal to amend the ethics rules to require nondiscrimination in the practice of law, which caused a lot of our conservative religious members to be up in arms about, are we gonna take that position? And I can tell you this is not in the record, unfortunately, but I was at the meetings, and we absolutely said we're not going to take these kinds of severely controversial political and divisive issues, and recommend to the Louisiana Supreme Court that they incorporate them into the ethics rules through a nondiscrimination rule. So yes, those issues do come up, but the tradition has always been that our Bar takes a step back. The only time we did not do that was in connection with those prior legislative activities, all of which have been rescinded, all of which are gone. And the Supreme Court has enacted this rule limiting us to these six categories. And I think as this court knows, with voluntary cessation, state actors, like the justices of the Supreme Court, are entitled to a presumption that they took that action in good faith, and they will follow it up. We didn't propose that the Supreme Court change this rule. Within two months of McDonald, the Supreme Court did it, and issued the rule. We got the message. And six months later, we had this House of Delegates meeting where we rescinded all of these old rules, and changed it to comply with this court's decision in McDonald. You know, to some extent, it's difficult, because we really feel we've made enormous strides to follow and comply with this court's ruling in McDonald. This case is about what's left, Judge Smith. What's left is a few tweets. And if, in fact, somebody got a little bit exuberant in a tweet, and crossed the germaneness standard, does that equal an injunction against the bar for one tweet out of 1,000 over two years? And that brings us to the Hudson principles. Under Hudson, what are those four if not to remedy insubstantial violations? Insubstantial, I call them foot faults, if you will. Even Mr. Boudreau, if you see his testimony in the record, he agreed with me on cross-examination that he did not disagree with the House of Delegates policies. He particularly didn't disagree with the wellness tweets. And he said, I asked him, why didn't you object to these things? He said, it wasn't really worth my time. Or the effort. Well, that's not a constitutional injury. Okay, we're talking about de minimis violations. We're talking about the curtsy and dour position of the Wisconsin bar in Lathrop, which the court said, that's just not enough to bring us into the freedom of association realm. And that got the vote of more than four justices. So what we have here is this court in McDonald's speaking clearly and decisively and creating a line, removing the fog of Lathrop. We have absolutely done enormous efforts to try to comply with that line. And the district court found that we were sincere and that we're not gonna do it again. And our budget confirms that. There's zero money for legislation. If there is a minor transgression, you can object. And if you object, we escrow the money. We have the right Hudson procedures and you get a refund. And so that's that. That's the best we can do. But we have served Louisiana for 82 years. We have served the court for those 82 years. We are trying to comply. The bar is and so is the court with all of the directives of this court. We simply request that the court affirm the district court's decision. Thank you. All right, thank you, Mr. Stanley, Mr. Bair. So Mr. Bair, Mr. Stanley did accurately refer to the fact that McDonald did give some recognition of the legitimacy of diversity initiatives. So would you please address what your view is of what McDonald said about that and in what respect you think that those restrictions are being exceeded now by the bar? Absolutely, Your Honor. This court in McDonald talked about diversity initiatives generally, that these were acceptable pursuits. But there's an enormous distinction between non-discrimination, for example, which Mr. Boudreau went to Baton Rouge and testified that he was against non-discrimination versus racial preferences. And we would say that the court left open this issue. In footnote 28 and 29 of your opinion, this court talked about students for fair admissions, but also talked about the bar cannot just, it doesn't mean that this is limitless. The bar cannot just take sophistic arguments, is the term that the court used, or attenuated arguments for why these are germane issues. And the court was very clear in that opinion. Some people can view diversity as involving civil unions and gay marriage and issues that the court was very clear are not germane in that opinion. So. What I'm hearing your answer, I'm not trying to put words in your mouth, but I'm trying to understand that it is somewhat an open question whether, for example, a mention on the website of Pride Month would violate McDonald or whether that's something that we should speak to that has not been foreclosed by McDonald. Is that fair? Yes, Your Honor. It hasn't been foreclosed by McDonald. And for us, it's a clear philosophical injury. It's a clear philosophical non-germane proclamation on the website continuing to this day. The court asked a couple of questions about this diversity issue. First of all, I need to clarify, those six policy positions that were adopted by the bar include diversity. It's the last one. It's in the record. And this court can look at that. Finally, they've talked about, hey, these were mandated by the Supreme Court. Those six policy positions are from the LSBA, not from the Supreme Court. The Supreme Court said the LSBA has to follow McDonald and has to follow germaneness. And the LSBA said these are six policy positions that we still take. And that last one includes diversity. And you talked a little bit about affirmative action. Well, affirmative action in the wake of students for fair admissions, it cannot be germane for the bar to be advocating for unconstitutional racial discrimination. And there's been a change in the law. The court has come down and said racial preferences are unconstitutional racial discrimination. It can't be germane for the LSBA to be tweeting about their support for those kinds of issues anymore. What did the Supreme Court say, though, about whether it's legitimate to consider diversity as distinguished from race? Broadly speaking, of course, diversity is acceptable. And we think this is exactly the issue left open in McDonald. In that footnote, the court identified that there are some issues of diversity that go too far. There are some issues that are acceptable. Non-discrimination is acceptable. Talking about diversity generally being good is acceptable. But putting an LGBT pride flag, which represents tremendous issues about the transgender movement, about LGBT rights that are not germane to the practice of law, they're not necessary for lawyer regulation. There's no reason to compel Mr. Boudreau to make those statements and to associate with an organization that does. In terms of the other tweets, Your Honor, just to touch on those briefly, we talked about student debt, we talked about lawyer wellness. Again, this goes to the sophistic and attenuated arguments. Anything could be good for lawyer wellness. And the court also addressed the advertisement for the Red Mass, a religious service. And I'm not sure it's going on myself, but should the bar be tweeting out about supporting particular religious services or urging people to go to those? Again, the bar needs to confine itself to the regulation of the practice of law. And just- Your complaint about references to lawyer well-being really baffled me because everybody knows that lawyers have personal problems, including health problems and others that affect the practice of law and the service to their clients. I just can't imagine why you say that that isn't germane. I think it undermines the credibility of your presentation if you're still insisting on that. Okay, Your Honor, and we would because, you know, Mr. Boudreau, first of all, opposes being a member of the bar at all. But the fallback position, of course, is that it should be strictly focused on the regulation of the practice of law. And otherwise, there needs to be a clear enough line that it's crystal clear. It needs to be a clear enough rule that even lawyers can follow it. And currently, we don't have that line because the bar is continuing to engage in activities that we believe are non-germane. Now, some of this is going to be hard to decide, and that's part of the process. But this is about a philosophical injury that's profound and affects Mr. Boudreau, he testified to in the trial. So we would argue that the founders were right. Freedom of association is the correct approach. We would ask for an injunction and a declaration as we've requested. Thank you, Your Honor. So I meant to ask you about that, so thank you for your closing. Because I need to understand, I went back and looked at the last couple of pages of your blue brief. Summarize for us in a couple of sentences what it is that you're asking to be done. I mean, I think I hear you saying that there should be no mandatory membership required at all, but maybe you're falling short of that. So just explain again, not more than two sentences. Yes, sir. What are you asking for? We've asked for six things, four declarations and two injunctions. The injunctions are similar to McDonald, that he should not have to continue to pay dues into a bar that engages in non-germane speech, and that he should not be required to continue to be a member. Now, we understand that that issue has been resolved in terms of his overall membership. We're preserving it for the record. And the declarations are that his free speech and his free association are violated by the bar's political speech, by his membership, which associates him with that speech, and by his bar dues. So we would ask for a declaration and an injunction on those two grounds that until and unless the bar ceases to engage in non-germane speech, he should not be required to pay bar dues, just as this Court did in McDonald. Should that injunction be fashioned by us, or should we be remanding to the district court to decide what an injunction would say? This Court enjoined directly in McDonald, and in that final, it remanded for the remedies phase, but it also enjoined during the remedies phase and said that the bar could not compel dues during the pendency of that remedies phase. All right, thank you, Mr. Berry. Thank you, Your Honor. Both of today's cases are under submission, and the Court is in recess until nine o'clock tomorrow. Thank you.